IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PAMELA PARKINS, on behalf of<br>Calvin L. Parkins, deceased, | ) | |
| | ) | 4:08CV3206 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Claimant Calvin L. Parkins ("Parkins") suffered a subarachnoid hemorrhage during the pendency of this social security action, and he passed away on October 25, 2007. Social Security Transcript ("TR") at 103. Pamela Parkins has been substituted as the named plaintiff, (TR 106), and pursues this claim on behalf of her deceased husband.

Parkins seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner"), denying his applications for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq., and for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. After carefully reviewing the record, the court finds the Commissioner's decision should be affirmed.

## I. PROCEDURAL BACKGROUND

Parkins applied for social security disability benefits on February 24, 2005. TR 61, 63, 500, 502. Parkins claimed discogenic and degenerative back problems with associated pain, the effects of a stroke, mood disorders, hypertension, diabetes and arthritis rendered him disabled and unable to work. TR 500-503, 516. His application

for disability benefits was denied initially on May 23, 2005, (TR 71-75), and upon reconsideration on October 24, 2005.  TR 64-68.

Parkins filed a hearing request on October 31, 2005.  TR 57.  The hearing was held before an Administrative Law Judge ("ALJ") in Scottsbluff, Nebraska on February 5, 2008.  TR 51.  Testimony was received from Pamela Parkins on behalf of the claimant, and from a clinical psychologist, Michael Enright, Ph.D., and a vocational expert ("VE"), both of whom appeared at the ALJ's request.  TR 536.  The ALJ's adverse decision was issued on March 8, 2008, (TR 18-33), and Parkins' request for review by the Appeals Council was denied on August 27, 2008.  TR 7-9.  Parkins' pending complaint for judicial review and reversal of the Commissioner's decision was timely filed on October 7, 2008.  Filing No. 1 (Complaint).

## II.   THE ALJ'S DECISION.

The ALJ evaluated Parkins' claims through all five steps of the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920.  TR 18-33.  As reflected in his decision, the ALJ made the following findings:

1.    The claimant met the insured status requirements of the Social Security Act through March 31, 2007.

2.    The claimant had not engaged in substantial gainful activity since December 15, 2004.[1]

---

[1]Parkins claims the onset date was actually April 4, 2004.  See, TR 204.  Since the court finds Parkins was not disabled, the court need not and will not resolve any discrepancy regarding the onset date.

3.    The claimant had a history of an adjustment disorder with depressed mood, mild degenerative disc disease and back pain, diabetes mellitus type II, and obesity, impairments considered to be "severe" under the Social Security Regulations.

4.    The claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    The claimant had retained a residual functional capacity to:

--    lift and/or carry 20 pounds occasionally and 10 pounds or less frequently with use of a walker to carry;

--    stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-hour workday;

--    sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, provided he could alternate between sitting and standing/walking every 30 to 45 minutes if needed;

--    other than as stated above for lifting and/or carrying, push and/or pull (including operating hand and/or foot controls), without limitations;

--    occasionally climb ramps and stairs, but not climb ladders, ropes or scaffolds; and

--    occasionally balance, stoop, kneel, crouch and crawl;

provided Parkins was not subjected to workplace hazards such as unprotected heights and dangerous machinery; was able to possess and

use diabetes blood testing equipment and respond to the results of such testing with medication, snacks, and beverages as needed, and the work was simple, routine, and repetitive in nature.

6.  The claimant was unable to perform any past relevant work.

7.  The claimant was forty-one years old on his alleged onset date, which is defined as a younger individual under the social security regulations.

8.  The claimant had at least a high school education and was able to communicate in English.

9.  Transferability of job skills was not material to the determination of disability because, using the Medical-Vocational Rules as a framework, the claimant was "not disabled," whether or not the claimant had transferable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, the claimant was able to perform jobs which existed in significant numbers in the national and regional economy.

TR 24-32.

## III.  NOTICE OF PARKINS' DEATH.

The ALJ's decision states a "certificate of death indicates the claimant died October 25, 2007 due to a "subarachnoid hemorrhage."[2]  There are no records

---

[2]Subarachnoid hemorrhage is bleeding in the area between the brain and the thin tissues that cover the brain. This area is called the subarachnoid space.

indicating the cause of the subarachnoid hemorrhage, or indicating it was related to Parkins' underlying complaints of symptoms caused by a stroke.  There is nothing to indicate a autopsy was performed.  Parkins' date last insured was  March 2007, (TR 88, 557), prior to Parkins' death. See, 20 C.F.R. § 404.130.  At the close of the hearing, the ALJ asked Parkins' attorney if he had anything further to offer.  The attorney stated he attempted to obtain the recent updated clinic notes from the VA, but he could not due to an outdated signature. TR 556-57.  Under such circumstances, the ALJ was required to analyze Parkins' records for the relevant time period prior to his death.  Those records reveal nothing to indicate the subarachnoid hemorrhage which caused Parkins' death was in any way relevant to Parkins' social security benefits application.

## IV.   ISSUES RAISED FOR JUDICIAL REVIEW.

Parkins claims the ALJ posed an inaccurate and incomplete hypothetical question to the VE, and the VE's response cannot be relied on in determining the claimant is not disabled, because in formulating the hypothetical question, the ALJ: 1) failed to afford considerable weight to the opinions of Parkins' treating physicians, 2) erroneously concluded the claimant's subjective medical and mental health complaints were not credible; 3) failed to fully develop the record; 4) failed to afford sufficient weight to the VA disability rating; and 5) relied on the residual functional capacity determinations of a non-treating physician and psychologist, and the testimony of a non-examining psychologist.

## V.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

As of December 15, 2004, Parkins was forty-one years old, and had completed high school and eighteen months of technical school training.  TR 141, 276, 361. From

_____

http://www.nlm.nih.gov/medlineplus/ency/article/000701.htm

1985 until 1990, Parkins served in the U.S. Army.  Thereafter, he stocked bags of insecticide (1991); worked as a pipefitter helper (1992-1993); performed janitorial work (1993); drove a truck (1993-1994); was a shag driver (1994-1999); and stocked shelves for Wal-Mart (2000-2001).  TR 109.

Between 1987 through 1989, while in the military, Parkins was seen several times for back pain.  TR 373, 376.

Parkins was apparently involved in a motor vehicle accident in the mid-1990s, and may have hit his head on the windshield when the accident occurred.  TR 325, 334.  On July 23, 1999, an electroencephalogram ("EEG")was performed due to complaints of "tremors and altered mentation."  TR 185.  The EEG was "within normal limits, with no evidence of focal slowing, and no evidence of epileptiform activity."  TR 185.

Parkins was first seen by Matthew Beacom, M.D. for complaints of back pain in December 2000.  An MRI of Parkins' lumbar spine, performed on December 7, 2000, revealed mild degenerative changes of degenerative disc disease, L5-S1, and mild diffuse disc bulge L4-5 and L5-S1 without focal disc protrusion.  TR 432.

Parkins was next examined by Dr. Beacom for back pain on December 6, 2001. At that time, Parkins stated he was injured when a stereo fell on him while working at Wal-Mart.  Parkins reported having a history of back treatment and testing, including  MRIs,  neurosurgeon  evaluations,  and  anesthesia  pain  management treatment.  Parkins stated no surgery was performed or recommended because He was considered a poor surgical candidate due to underlying medical problems,.  TR 272-73.  There  is no evidence Dr. Beacom obtained or reviewed Parkins' prior medical records.  There is no evidence that such records exist or could have been retrieved by anyone, including the ALJ.

An MRI of Parkins' lumbar spine performed on December 11, 2001 revealed:

1.   Mild broad disc bulges, L4-5 and L5-S1

2.   Some lateralization to the left at L5-S1 with very slight mass effect upon the left S1 nerve root as it is exits the thecal sac, unchanged from prior exam.

3.   Degenerative change involving the disc spaces and facets at the lower level, particularly at L4-5 and L5-S1.

TR 431.

At the referral of Dr. Beacom, Parkins' was seen by a neurologist, Dr. Maniula Tella, on February 14, 2002. TR 183. Parkins claimed his back problems began in the 1980s when he was serving in the military, he had not been able to work since 2001, and he reportedly wanted surgery because he could no longer stand the pain. TR 183. Parkins stated he had previously received a lumbar epidural injection, which made the pain worse, he was previously told "no surgery was needed," and was advised to lose 30 to 60 pounds. The examination performed was essentially normal, although his left straight leg raising was not tested due to complaints of pain. There was no muscle atrophy. Electrodiagnostic tests revealed "a subtle mild chronic neuropathic change in left L4 distribution." TR 184. An MRI was again performed, and other than some degenerative changes at the facets of L4-5 and L5-S1, the results were "relatively unchanged in appearance" from the previous MRI. TR 425. No spondylolysis was noted. TR 425.

Parkins was again evaluated by Dr. Tella on April 24, 2003 when, having applied for disability, he "was advised by Social Security Disability to see a neurologist to have a neurological exam." Parkins was taking Oxycontin for pain. He claimed he could not move, enjoy or care for his kids, do laundry, or work. Parkins was very emotional and teary-eyed during the examination. His sensory examination did not reveal any major abnormalities. Dr. Tella again diagnosed ongoing back pain,

-7-

with pain in the lower extremities, left greater than right, mild L-4 radiculitis, and underlying depression from chronic pain. TR 181.

In July 2003, Dr. Beacom stopped prescribing Oxycontin, and began prescribing Avinza,[3] a form of morphine. TR 514. Thereafter, Avinza was prescribed monthly at Parkins' request. As of January 14, 2005, Parkins was prescribed Avinza 120 mg, 1 tablet daily "with no refills." TR 191. The prescription was, however, refilled monthly thereafter with the approval of Dr. Beacom until Parkins began receiving health care through the Veterans Administration ("VA"). Thereafter, Avinza was prescribed monthly by Parkins' VA physician.

On December 22, 2003, Parkins reportedly fell on the ice. He sought treatment from Dr. Beacom for exacerbated back pain. A back x-ray showed "some mild degenerative changes. No acute fractures." TR 210.

Dr. Beacom performed a "re-application disability physical" on April 4, 2004. TR 204. The primary diagnosis identified was back pain with radiculopathy for the last several years, with his ability to ambulate slowed by radicular back pain to the left leg and a markedly decreased range of motion of the lumbar spine. The secondary diagnosis was a history of a mild Transient Ischemic Attack or early stroke symptoms, Type 2 diabetes mellitus, hypertension and recurrent migraines. Dr. Beacom considered Parkins' prognosis "poor," and noted Parkins' severe back pain and history of TIA and stroke restrict his ability to work, limit his activities of daily living and the performance of daily home responsibilities, and necessitate pain management,

---

[3]"Avinza capsules are a modified-release formulation of morphine sulfate indicated for once daily administration for the relief of moderate to severe pain requiring continuous, around-the-clock opioid therapy for an extended period of time." http://www.rxlist.com/avinza-drug.htm

including the long term use of morphine.  However, Dr. Beacom concluded "[t]he patient should be able to provide most of his own personal needs for activity of daily living."  TR 204.

Dr. Beacom's record of April 4, 2004 states Parkins "has undergone some previous rehab and physical therapy with little to no improvement.  Has seen multiple other providers including the neurosurgeons . . . .  The patient has been through multiple therapy programs and we tried to encourage conditioning to prevent any further decline in his current status."  The social security transcript contains no records indicating Parkins attended rehabilitation or physical therapy, that any conditioning exercises were prescribed or recommended, or that he participated in any formal or informal physical conditioning program.  TR 204.

On May 18, 2004, when seen by Dr. Beacom for a constant cough, Parkins reported the Avinza was working for his back pain.  TR 202.

On July 20, 2004, Parkins was admitted to the Fremont Area Medical Center with complaints of chest pain.  The admitting physician, Dr. Beacom, also noted slurred speech, and Parkins complained of a headache and dizziness.  TR 257.  An MRI and CT scan were performed and revealed no evidence of a mass or acute infarct, but did show a small, old lacunar infarct in the left insula[4] which apparently dated back to the mid-1990s motor vehicle accident.  TR 256, 264-65, 325, 334,368,  416, 429, 466.  Parkins was released with a diagnosis of atypical migraine, chest pain, dysarthria, severe headache, history of stroke, hypertension, and diabetes.  TR 256.[5]

---

[4]The "[n]arrowing of the small arteries within the brain can cause a so-called lacunar stroke, (lacune=empty space).  Blockage of a single arteriole can affect a tiny area of brain causing that tissue to die (infarct)."  http://www.medicinenet.com/stroke/article.htm

[5]Parkins' brief states "[t]here is objective evidence in the file of Plaintiff's

Parkins filed his social security claim on February 24, 2005.  He completed a "Daily Activities and Symptoms Report" on March 14, 2005, and in that report, stated he cannot dress himself completely because he cannot bend, and can only cook one or maybe two meals a day because he "cannot stand for too long," (TR 119), but he does drive, and he can garden, hunt, and fish because he can sit or stand for these activities, with gardening being the most difficult because the stress it places on his low back.   TR 120.

Parkins was again examined by Dr. Beacom for a "disability physical" on April 22, 2005.  Dr. Beacom reported:

> The patient's range of motion examination was undertaken and when asked to get from a chair to standing he had to use both handles on the chair to propel himself upward.  He was unable to stand without the use of his arms.  He did wince with pain. Stepping up onto the exam table platform did take quite a bit of effort, and lying back on the exam table, full range of motion did cause him to actually cry out in pain.  I could not leave him on his back for very long as he had a significant amount of pain.  Straight leg raise positive bilaterally for back pain and range of motion of the cervical spine and lumbar spine were dramatically decreased.

TR 273.   Dr. Beacom concluded:

> The patient's ability to have employment requiring frequent movement from sitting to standing positions or awkward positions would be very difficult.  He certainly would not be allowed to do any lifting or significant repetitive motions.  His overall ability to be employed is not

back condition. A 2004 x-ray showed a 'severe arthritic change of the spine.' (TR 196)."  However, the referenced x-ray was a chest x-ray.  It is unlikely, or at least unclear, that the arthritic changes visualized were located in the lumbar area of the spine.

left to my judgment. His prognosis is poor. He has been out of work now for several years. His physical condition has declined and his pain has increased, as well as his risk for further cardiovascular diabetes complications have increased.

TR 273.

Parkins was admitted to the Fremont Area Medical Center on July 18, 2005, this time with complaints of dizziness, a sharp pain in the back of his head, right arm and hand weakness, and increased stuttering and speech problems. TR 437. The MRI of Parkins' brain was unchanged, and continued to reveal a small infarct in the region of the left insula. TR 466. Parkins was diagnosed as having a chronic mixed headache and an acute occipital headache, with dizziness and dysequilibrium. Parkins was released and began rehabilitation therapy for his memory and speech problems. TR 434-35, 474-97. Upon completion of the rehabilitation therapy, Parkins' stuttering was much improved, and his memory was "a little better" with the use of a memory notebook. TR 479.

On August 6, 2005, Patricia J. Blake, Ph.D. performed a psychological evaluation of Parkins at the request of Disability Determination Services. Parkins stated he was able to drive, prepare meals, mow the lawn with a riding lawn mower, play with his children, take them to the park and fishing, watch TV, and do "word find" puzzles. Dr. Blake reported Parkins appeared able to understand, remember, and carry out short and simple instructions under ordinary supervision; able to relate appropriately to coworkers and supervisors; and able to handle his financial affairs, but his ability to adapt to changes in the environment appeared limited. TR 277. She concluded Parkins exhibited psychomotor retardation; his speech was stuttered and slurred; his retrieval of background information and recent and remote memory tasks suggested some memory disruption; and he appeared depressed. His GAF was 63.[6]

---

[6]Global assessment of functioning (GAF) is the clinician's judgment of the

TR 278. Parkins scored in the average to low average range on Wechsler Memory Scale ("WMS") testing. Although Parkins needed extra time to complete the WMS examination, he did not appear to have an impaired memory. TR 161.

Based on Dr. Blake's testing and report, a Mental Residual Functional Capacity Assessment ("RFC") was completed by Linda Schmechel, Ph.D. on September 21, 2005. The mental RFC stated Parkins was partially credible with no significant limitations other that a moderately limited ability to: 1) understand, remember, and carry out detailed instructions; 2) work in coordination with or proximity to others without being distracted by them; and 3) respond appropriately to changes in the work setting. TR 157-58, 162. "Claimant has severe condition, but retains the ability to perform simple, unskilled work activity." TR 162.

A medical evaluation was performed by Dr. Jerry Reed on May 20, 2005. Dr. Reed noted Parkins "is addicted to Avinza and he is regularly taking one, if not more than one, per day. He's been on this for quite some time; the actual initial prescriber is unknown, but it is constantly being refilled by his current medical attendant." TR 141. Based on the records provided, Dr. Reed saw nothing to indicate Parkins had a stoke. Dr. Reed performed a neurological examination, and no neurological deficits were found. "He demonstrates a positive SLR bilaterally, although it initially started out as a unilateral phenomenon. He does not demonstrate any sensory loss, he does not demonstrate any motor loss." TR 141. Dr. Reed concluded:

---

individual's overall level of functioning, not including impairments due to physical or environmental limitations. See. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed. 2000)("DSM-IV-TR").A GAF of 61 through 70 is characterized by "some mild symptoms OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships."

> In general, the claimant's allegations are not well supported by fact, and indeed, the limitations that are given to him by his attending physician are not well documented in his own medical records as well. Reliability of both the referring physician as well as the claimant are somewhat suspect. Certainly, he seems to be capable on the basis of what objective evidence there is in his medical record of carrying out the functions as outlined in the current RFC.

TR 142. The RFC completed by Dr. Reed stated Parkins had no manipulative, visual, or communicative limitations, could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, had unlimited ability to push and/or pull within the previously described 20/10 pound limitations, could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, could not climb ladders, ropes and scaffolds, and had to avoid constant exposure to extreme cold, vibration, and work place hazards such as machinery or heights. TR 133-40; 169-72.

> Based on the sum of the information including his CE physical, it is felt that the claimant would have difficulty with stand/walk up to 6 hours per day. It is felt that he could do a sedentary job with light lift 20/10 and he should be allowed to change positions at regular breaks. Postural would all be occasional and he should avoid concentrated cold, and vibration as well as hazards.

TR 177. Dr. Reed concluded the severity and duration of Parkins' reported impairments exceeded the expected severity and duration of his medically determinable impairments. TR 138.

Parkins began receiving treatment at the VA in Omaha on April 12, 2006. He reported the following health concerns:

1.      A five-year history of non-insulin-dependent diabetes mellitus, which was under fairly good control with Avandia and a diabetic diet.

-13-

2.      A ten-year history of high blood pressure, also under good control.

3.      Chronic back pain dating back to carrying heavy missiles in the Army. Parkins' reported his past MRI's showed severe degenerative disc disease, and he had seen five neurosurgeons, all of whom told him he could have surgery but it would not help.  Parkins complained of pain and numbness radiating down both legs to his feet, left worse than right, and an occasional cold feeling in his left leg.  Parkins stated his prescribed morphine dulls the pain, but gabapentin, prescribed for symptoms of burning pain, provided no real relief.

4.      A questionable history of a cerebral vascular accident (stroke) dating back to a motor vehicle accident in the mid-1990s when Parkins hit his head on a windshield.  Parkins stated he was told he had a stroke at that time, and since the incident, he has experienced mental problems including slurred speech, stuttering, difficulty finding words, lapses in both long-term and short-term memory, and occasional difficulty holding onto things.

5.      Migraines which began after the motor vehicle accident, sometimes occurring two to three months apart, and sometimes occurring several days in a row.

6.      A one-year history of Gastroesophageal Reflux Disease (GERD), which is under control with aciphex.

TR 363-64.  Of these complaints, the VA concluded only Parkins' memory loss and back pain adversely affected his ability to work.  TR 333-37.

Parkins complained of low back pain and stiffness, and stated he could only stand and sit for 20 to 30 minutes and could barely walk one block  because of back pain. Parkins stated the pain radiated down his left leg causing numbness, and stated he had fallen four or five times in the past.  TR 377.  He denied needing any assistive device for walking or a back brace.  TR 333.  The VA examining physician reported:

-14-

His physical examination showed pain over the midline of the lumbar spine. He could not perform any forward flexion exercises at all because of severe pain. He was walking in a slightly hunched forward position because of pain and walked very slowly and he appears to be in moderately severe to severe discomfort. Posterior extension could also not be performed. Lateral flexion performed to 20° in both directions and lateral rotation to 20°, both with less difficulty, but pain was present throughout all of these. The DeLuca examination could not be performed because he was in too much discomfort. Deep tendon reflexes and ankle jerks were absent in the left lower extremity. The motor examination was as described. Sensation was moderately to markedly decreased in the left lower extremity to light touch, pinprick, monofilament examination. Major functional impact: Pain with any attempt at repetitive use.

TR 377-78. The x-rays performed revealed fused, bilateral sacroiliac joints, and multilevel degenerative disease of the lumbosacral spine. TR 386.

The VA physician diagnosed "chronic mechanical low back strain" with "radiulopathy symptoms affecting the left leg, likely due to disc disease," ( TR 375-76), and concluded:

Based on observation as to the degree of the veteran's discomfort and standing up, sitting down, and ambulating the short distance from the waiting room into the examination room, this condition would adversely affect any type of physical employment, that would require sitting greater than 30 minutes, standing more than 20 minutes, walking more than a few feet, or lifting more than 20 pounds. He clearly adversely affects his daily activities, as well, chores, sports, recreation, exercise, driving, sitting, standing, shopping, hygiene, grooming, dressing, and toileting.

TR 334.

Parkins received neuropsychiatric testing from the VA on April 20, 2006. The Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) and Trailmaking Test Parts A and B were administered by William H, Keller, Ph.D. TR

-15-

305.  RBANS testing revealed a serious problem with delayed memory and attention as follows:

> [Parkins] functioned at the below-average level in immediate memory (l0th percentile for his age group) and had significant impairment in delayed memory (2nd percentile) . He had serious deficits in attention (less than 1st percentile) . He was just below the cutoff for the average range of intelligence on language functioning (23rd percentile).  He performed above average in visuospatial/constructional tasks (76th percentile) .

TR 305.  Dr. Keller concluded the Trailmaking test result was compatible with persons with known brain damage.  During the testing, Parkins stated he did not know the income or indebtedness of his household, and his wife handled his financial affairs because he was unable to do so.  Parkins could not recall the answers to several questions, and his personal hygiene was very poor.  His attention span was short, and his speech was slurred, halted, and stuttered. Although Parkins believed he lacked eye hand coordination, that problem was not observed by Dr. Keller.  The VA concluded:

> Based upon the severity of the veteran's impaired memory, even during this evaluation, this condition would adversely affect employment of any type.  He could not stay focused or recall the specific topics we were addressing for more than about 10 to 15 seconds per issue.  His memory impairment also adversely affects his daily activities, and his wife has to pick up after him continuously.  He has no treatment for residuals of stroke other than the Zomig for his headaches.

TR 335.

Parkins was placed "on disability 70% with 100% unemployable."  TR 323.

The VA further concluded Parkins was unable to handle his financial affairs and should not purchase a gun.  (TR 323, 348), a determination which angered Parkins and prompted him to seek a second opinion from the VA facility in Hot Springs, South

-16-

Dakota.  TR 320.   On December 4, 2006, Parkins was evaluated at the Hot Springs VA by Kathleen E. Baumiller, a nurse practitioner working under the supervision of Dalton D. Burkholder, M.D.  Nurse Practitioner Baumiller reported:

> This is an unkempt male veteran wearing a dirty stained T-shirt, with a body odor.  He arrives in a wheelchair complaining of feeling dizzy from walking so far.  He is able to get up and transfer to a chair.  He ambulates with a kyphotic wide based gait.  Eye contact is good at times and at times when trying to remember things he closes his eyes.  Affect is sad and tearful.  Mood is depressed and anxious.  Speech is stuttering with significant word finding difficulties.  Thought processes are noted to be impaired primarily due to memory problems.  Content is answering questions and focusing on competency.  There is no attending to internal stimuli.  Fund of knowledge is adequate, intelligence is estimated to be low average.  Judgment and insight are impaired.  Recent and remote. memory are grossly impaired, a St. Louis University mental status exam was done which scored him in the "needs more evaluation" range.

TR 325.  She reported Parkins' GAF as 48.[7]  TR 326.  After performing the foregoing examination and reviewing the testing performed by William H. Keller, Ph.D., Nurse Practitioner Baumiller agreed with Dr. Keller's competency determination and recommended that Parkins participate in a cognitive rehabilitation program.  Parkins stated he was not interested because "he has a hearing on the 15th and was hoping to have a different opinion by then."  TR 326.

On March 9, 2007, Parkins was seen at the Hot Springs VA for a sore throat, and during that visit, asked to be evaluated for a walking aid such as a walker or cane

---

[7]A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  See, DSM-IV-TR, at 34.

so he could get around without a wheelchair.  TR 318.  The VA prescribed a rollator walker.  TR 319.

On October 1, 2007, Dr. Burkholder completed a checkbox questionairre indicating that if Parkins performed sedentary or light work, 5 days a week, 8 hours a day, with normal breaks, he would need the option of alternating at will between sitting and standing, and would occasionally (3 or more days/month) need several additional unscheduled rest periods (of at least 10-15 minutes) to lie down or recline to relieve pain, have difficulty maintaining sustained attention and concentration to perform even simple and repetitive tasks, and have unpredictable absences from work.  Dr. Burkholder noted that Parkins' main limiting factors for employment were "mental–overshadowing his physical limitations."  TR 298-99.

At the social security hearing held on February 5, 2008, Pamela Parkins testified that her husband was very forgetful, needed a list to remember things, would forget to bathe or shower, and could not handle the family's finances, fill his own pillbox, or be trusted to correctly take his medications without reminders.  TR 540-41.  He could not fully dress himself, and lacked the stamina to finish cooking dinner.  TR 544.  When he shopped, he used a cart so he could lean on something.  He slept until 9:00 or 10:00 a.m., and then sat in a recliner in the afternoon and napped for an hour or two.  TR 545.  Pamela Parkins testified her husband loved hunting and would use his walker to find a place to sit and wait to see and shoot a deer.  TR 543.

Clinical psychologist Michael Enright provided testimony based on his review of Parkins' records.  Dr. Enright testified that from a mental health standpoint, Parkins was limited to simple routine and repetitive work.  TR 548.  Dr. Enright relied on the WMS testing performed by Patricia J. Blake, Ph.D. rather than the RBANS and Trailmaking testing administered by the VA in forming his opinion.  Dr. Enright testified the WMS has very strong validity support and reliability data and is the "gold standard" of memory testing, while the neuro-psychological battery performed by the

-18-

VA is relatively new, is abbreviated, has not been shown to be reliable or valid, and the VA did not identify a psychological diagnosis or state whether Parkins was taking medication when the testing was performed.   TR 548-52.

Consistent with Parkins' physical and mental RFC assessments, and the testimony of Dr. Enright, the ALJ asked the VE to assume a person of Parkins' age, education, and work experience:

-- was limited to occasionally lifting and carrying up to 20 pounds and frequently lifting and carrying 10 pounds or less;

-- could stand and/or walk for at least two hours and sit at least six hours in an eight-hour workday with normal breaks;

-- needed to alternate as needed between sitting and standing every thirty to forty-five minutes;

-- could push or pull as needed to operate hand or foot controls within the weight restrictions for lifting and carrying;

-- could only occasionally go up or down stairs or steps; could never use ladders, ropes, or scaffolds, or work at unprotected heights or with dangerous machinery;

-- could at least occasionally balance, stoop, kneel, crouch and crawl;

-- needed access to blood sugar testing equipment and to food, beverages, or medicines to respond to testing results; and

-- could only perform simple, repetitive work.

TR 553-54.  Assuming Parkins was limited as described above, the VE testified Parkins could not return to his past work. TR 554. However, the VE testified Parkins could perform the sedentary, unskilled position of telephone information clerk, with

-19-

50,000 such positions existing nationally, and 700 in the Nebraska, South Dakota and Wyoming region; or he could perform the sedentary, unskilled position of  callout operator, with 40,000 such positions existing nationally, and 700 jobs existing regionally.  According to the VE, both jobs could be performed while using a walker. TR 554-55.

## VII.  ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.  A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed.  Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  Id. See also, Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  In other words, "a position can be justified even though it is not correct."  Pierce v. Underwood, 487 U.S. 552, 566 n. 2 (1988).

Parkins claims the ALJ incorrectly evaluated the evidence and, as a result, posed a hypothetical question to the VE that was unsupported by substantial evidence.  He claims the VE's response to the improper hypothetical question cannot provide a basis for denying social security benefits.  As explained in the ALJ's decision, the parameters of the hypothetical question were based on the ALJ's determination of Parkins' credibility and the weight given to the opinions of plaintiff's physicians (Drs. Burkholder and Beacom), the VA psychological testing performed by Dr. Keller and

Nurse Practitioner Kathleen Baumiller, the opinions of Dr. Keller and Ms. Baumiller, the VA's determination that Parkins was 70% disabled and 100% unemployable, and as to plaintiff's mental impairments, the opinions of a "non-examining, paper review expert," Dr. Enright.   Parkins claims the ALJ erred in concluding Parkins was not fully credible and in failing to afford controlling or substantial weight to the claimant's treating medical and mental health providers.

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009).  Moreover, even if the ALJ concludes the treating source's medical opinion is not entitled to controlling weight, it may still be entitled to deference and be adopted by the adjudicator.  SSR 96-2p, 1996 WL 374188 at *1 (S.S.A. 1996).  However, a treating physician's opinion "does not 'automatically control' in the face of other credible evidence on the record that detracts from that opinion. . . .  An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence."  Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009) (internal citations omitted); Medhaug, 578 F.3d at 815.

The regulations require the ALJ to explain why other sources of medical evidence were considered more persuasive than the treating source's medical opinion. Factors to be considered in weighing medical opinions from treating sources, nontreating sources, and nonexamining sources include: 1) the examining relationship between the individual and the medical source; 2) the treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination; 3) the degree to which the medical source presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings; 4) how consistent the medical opinion is with the record as a whole; 5) whether the opinion is from an "acceptable medical source" who is a

specialist and is about medical issues related to his or her area of specialty; and 6) any other factors brought to the ALJ's attention which tend to support or contradict the opinion.  SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006).

The ALJ concluded "[t]he claimant had a history of an adjustment disorder with depressed mood, mild degenerative disc disease and back pain, diabetes mellitus type II, and obesity, impairments considered to be 'severe' under the Social Security Regulations, " (TR 24), but "the claimant's high blood pressure and headaches are considered 'not severe' under the Social Security Regulations," and the claimant's "alleged history of a stroke and traumatic brain injury are unsupported by objective clinical findings." TR 25.

Other than the need to monitor and respond to blood sugar testing, an accommodation or condition incorporated into the ALJ's hypothetical question, there is no evidence of any impairment arising from Parkins' diabetes or hypertension.

As to Parkins' back condition, rather than the opinions of Parkins' physicians, the ALJ relied on the medical RFC assessment performed by Dr. Jerry Reed. Dr. Beacom's letter of April 22, 2005 stated Parkins' "ability to have employment requiring frequent movement from sitting to standing positions or awkward positions would be very difficult, he certainly would not be allowed to do any lifting or significant repetitive motions."  However, the objective testing of record did not support a finding of debilitating back injury.  Throughout the course of Parkins' examinations by Dr. Beacom and Dr. Tella, the medical records indicated only mild degenerative changes at L5-S1, a mild diffuse disc bulge at L4-5 and L5-S1, with some lateralization to the left at L5-S1 and a very slight mass effect upon the left S1 nerve root, no muscle atrophy, no spondylolysis, and on EMG testing, only "a subtle mild chronic neuropathic change in left L4 distribution."  Other than when he fell on the ice in December 2003, Parkins' examinations for back pain performed by Drs. Beacom and Tella were periodic "disability evaluations" and "disability re-

-23-

evaluations."   Although Parkins reported back pain when seen at the VA, the VA's testing was incomplete due to Parkins' subjective complaints of pain, the x-rays were consistent with the testing performed by Drs. Beacom and Tella, and there is limited information of record explaining why Parkins was considered "disability 70% with 100% unemployable."   Dr. Burkholder opined that Parkins' impairments were primarily mental, not medical. TR 298-99.

Referring to Drs. Beacom, Tella, and Burkholder as "treating physicians" is questionable since none of these doctors  prescribed or recommended any procedures or therapies to resolve Parkins' complaints of back pain, and the sole response by Dr. Beacom and the VA to Parkins' complaints was renewing morphine prescriptions at Parkins' request on a monthly basis.   Parkins complained of ongoing pain, and the prescription was renewed for another month. By the time Parkins was examined in 2005 for his physical RFC assessment, Dr. Reed believed Parkins was addicted to Avinza.  As the ALJ noted. "the claimant's back pain complaints were only for refill of his narcotic medication. . . ."  TR 28.

The plaintiff's mental health issues allegedly dated back to a "stroke" or traumatic brain injury occurring in 1999. As specifically explained in the ALJ's decision, "there are no neurological deficits demonstrated anywhere in the medical record."  TR 24.  The EEG performed in 1999 was "within normal limits with no evidence of focal slowing," (TR 185), and although several MRI and CT scans revealed a small lacunar infarct of the left insula, there is no medical evidence of resulting symptoms.  Parkins received "no treatment for residuals of stroke." TR 335.

Rather than the neuropsychological testing and assessments performed by Dr. Keller and Nurse Practitioner Baumiller at the VA, the ALJ relied on the testing performed by Dr. Patricia J. Blake, Ph.D., the mental RFC assessment completed by Linda Schmechel, Ph.D., and the testimony of Dr. Michael Enright, Ph.D.  A disparity exists between the results of the testing performed by Drs. Keller and Blake.  Dr.

-24-

Keller performed the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) and  Trailmaking Test Parts A and B in 2006 and concluded Parkins had a serious problem with delayed memory and attention,  and his test results were compatible with persons with known brain damage.  Dr. Keller did not, however, identify a diagnosis or prescribe any treatment, and did not schedule any follow up appointments or testing.  Parkins himself objected to Dr. Keller's findings and sought further testing at the VA in Hot Springs, South Dakota.  Nurse Practitioner Baumiller did not repeat Dr. Keller's testing, perform her own testing, or disagree with Dr. Keller.  Like Drs. Beacom, Tella, and Burkholder, Dr. Keller and Ms. Baumiller examined Parkins, but were not actually treating providers.  Ms. Baumiller did report a GAF of 48, indicating serious symptoms or a serious impairment in social, occupational, or school functioning, but as the ALJ's decision states, a nurse practitioner is not an acceptable medical source under the social security regulations. Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003) (holding a nurse practitioner and certified therapist were not "acceptable medical sources," but as "other medical sources" they could provide evidence regarding severity of claimant's impairment, and its effect on ability to work).

Dr. Blake, a licensed clinical psychologist, reported Parkins GAF as 63 in 2005, indicating Parkins was functioning with only some mild symptoms or difficulty.  TR 278.  This GAF was consistent with Parkins' average to low average range on Wechsler Memory Scale ("WMS") testing, (TR 161).  As explained by Dr. Enright, the testifying clinical psychologist, the testing performed by Dr. Blake is considered the "gold standard" of memory testing with strong validity and reliability data, while the testing performed by the VA is newer, abbreviated, and basically untested in terms of reliability.  Moreover, there is nothing of record to indicate Dr. Keller spent more, or even as much time interacting with or evaluating Parkins to gain insight concerning his complaints of mental impairment.

-25-

As to both the mental and physical testing results reported by Drs. Beacom, Tella, Burkholder, and Keller, the results were dictated in large part by Parkins' subjective complaints. The physical evaluations included Parkins' complaints of pain, and some tests were not performed, or were not completed due to such complaints; the mental assessments included observations or complaints of dizziness, memory problems, failure to maintain eye contact when communicating, and lack of attention span. As to Parkins' subjective symptoms and associated limitations and impairments, the ALJ found "the claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of the medical evidence and the discrepancies between the claimant's allegations and the information contained in the documentary reports."  TR 28.

To assess a claimant's credibility, the ALJ must consider all the evidence, including :

(1)    the claimant's daily activities;

(2)    the duration, intensity, and frequency of pain;

(3)    the precipitating and aggravating factors;

(4)    the dosage, effectiveness, and side effects of medication;

(5)    any functional restrictions;

(6)    the claimant's work history; and

(7)    the absence of objective medical evidence to support the claimant's complaints.

Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (Finch v. Astrue, 547 F.3d 933, 935 (8th Cir.2008);  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984)).  The ALJ is not required to discuss methodically each of these factors, so long as the ALJ

acknowledges those considerations before discounting the subjective complaints, makes an express credibility determination, and explains the reasons for discrediting the claimant's complaints.  Id.

The ALJ's decision  discusses several factors he considered in determining Parkins was not fully credible.  As previously explained, the ALJ noted  the inconsistency between the mild or minimal objective medical findings noted in the medical  records and the severity of Parkins' subjective complaints of pain and memory loss, and his observed lack of attention span.  The ALJ specifically noted Parkins was addicted to narcotics, and was seeking medical evaluations "to get disability for his back." TR 28.  Both of these circumstances can motivate a claimant to exaggerate his subjective symptoms.  The ALJ considered Parkins' lack of medical "treatment," a factor Parkins argues should not influence the credibility determination since Parkins "was not a suitable candidate for back surgery."  Filing No. 13, at CM/ECF p. 22.  However, there are treatment modalities other than surgery, (e.g. exercise, heat, stretching, etc.), and it can certainly be inferred that had Parkins been suffering to the degree he claims, he would have sought treatment options from others, including specialists, once he realized Dr. Beacom had nothing to offer.  Parkins was seen at the VA, but apparently for evaluation, not treatment.

The ALJ further noted the apparent inconsistency of Parkins' ability to "walk unaided" to his examination in April 2006, while complaining of extreme pain upon standing at other times, and asking for and receiving a walker in March 2007. According to his wife's testimony, Parkins used the walker to go hunting, and according to Parkins' self-report, he continued to do some gardening, drive, prepare meals, mow the lawn with a riding lawn mower, perform auto mechanic work, take his children to the park and fishing, and do "word find" puzzles," all of which the ALJ considered inconsistent with the Parkins' subjective complaints.  See, Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir.1999) (finding that activities such as driving, shopping, watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain).

The ALJ's decision, fully supported by the record, explains why he credited the testimony of Dr. Enright, the physical RFC assessment by Dr. Reed, and the mental RFC assessment completed by Dr. Schmechel which incorporated the findings of Dr. Blake, and why he did not credit the reports and opinions of Drs. Beacom, Tella, Burkholder, and Keller, and Nurse Practitioner Baumiller. The ALJ's decision also explains his reasons for concluding Parkins' subjective complaints were not fully credible, and those reasons are supported by the record as a whole.

Parkins claims the ALJ failed to fully develop the record and failed to afford sufficient weight to the VA's disability determination. Parkins' counsel has not identified any additional records which exist or could have been retrieved, and at the close of the hearing, acknowledged to the ALJ that while more recent VA records may exist, they could not be obtained due to Parkins' outdated signature coupled with his death. TR 556.

As to the VA's disability determination, a disability decision by the VA is based on its rules, not those of the Social Security Administration, and therefore the VA's determination was not binding on the ALJ. See 20 C.F.R. § 404.1504. The VA's disability finding may be entitled to some weight, but as explained in the ALJ's decision, Parkins' VA physical evaluation was based on presuming Parkins subjective complaints of pain were credible--a finding at odds with the ALJ's review of the record as a whole. As to the mental assessment, the VA performed neuropsychological testing; but it did not render a diagnosis, it is unclear whether Parkins was under the influence of medication when the test was performed, and the testing formats and procedures used by the VA have not been shown to be valid and reliable in the profession. Under such circumstances, and considering the record as a whole, the ALJ was not required to afford weight to the VA's physical or mental disability determinations. Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996).

-28-

A hypothetical question posed to a VE "need only include those impairments and limitations found credible by the ALJ." Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005)). After evaluating Parkins' credibility and the weight to be afforded to the medical and mental health evidence of record, the ALJ's hypothetical question was based on Parkins' medical and mental RFC assessments and Dr. Enright's testimony. The RFC assessments identified what Parkins was able to do despite the limitations caused by all of his impairments. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). The factors included in the hypothetical to the VE were supported by the record, were consistent with the ALJ's credibility determination, and the VE's response provided a sufficient basis for finding Parkins was "not disabled."

Upon review of the record as a whole, the court finds substantial evidence supporting the ALJ's decision. Accordingly,

IT IS ORDERED that the findings and conclusions of the ALJ are affirmed.

November 5, 2009.               BY THE COURT:

                                *Richard G. Kopf*
                                United States District Judge